## MISSOURI VALLEY STEEL COMPANY v. NEW AMSTERDAM CASUALTY COMPANY AND ANOTHER.

148 N. W. (2d) 126.

December 30, 1966—No. 39,987.

*Cant, Haverstock, Beardsley, Gray & Plant, Franklin D. Gray,* and *Charles K. Dayton,* for appellants.

*Swarr, May, Royce, Smith, Andersen & Ross, Robert H. Berkshire, Dougherty, Flynn & Scott,* and *Thomas Dougherty,* for respondent.

THOMAS GALLAGHER, JUSTICE.

Action by Missouri Valley Steel Company to recover $15,000 for steel sold to Lundquist Constructors, Inc., a Minnesota corporation. Included as a defendant in the action is New Amsterdam Casualty Company, a corporate surety on a public contractor's bond furnished by Lundquist Constructors, Inc., on a contract for the construction of a water-treatment plant for the city of Fairmont. It is the contention of defendants that the sum due to plaintiff from Lundquist Constructors, Inc., is only $4,834.72. The difference arises because payments made to plaintiff by Lundquist Constructors, Inc., in the sum of $10,165.28 were applied by plaintiff on debts owed it by Lundquist Construction Company, a copartnership comprised of Robert A. Lundquist and Eugene Coil, and by Robert A. Lundquist personally.

The court found that defendants were indebted to plaintiff in the full amount of $15,000 in that "Plaintiff was justified in applying the payments made by defendant Lundquist Constructors, Inc., as it did" and because Lundquist Constructors, Inc., had acquiesced in the procedure described.

This appeal is from an order denying defendants' motion for a new trial. It is defendants' contention that the stockholders and directors of Lundquist Constructors, Inc., had not authorized plaintiff to apply the payments on the debts of the prior business; and that there was nothing in the corporation's conduct which would estop it from questioning this application of the payments by plaintiff.

The facts are as follows: Prior to February 11, 1958, Robert A. Lundquist and Eugene Coil were engaged in business as a partnership under the name Lundquist Construction Company at LeMars, Iowa. The latter firm had purchased steel supplies from plaintiff for use in various construction projects and on the date mentioned was still indebted to plaintiff for such purchases. The copartnership had ceased to do business

some time prior to February 11, 1958, but Robert A. Lundquist there-after had continued in the construction business as an individual. In connection with the prior operations the copartnership had purchased steel from plaintiff, some of which had not been paid for at the time Lundquist Constructors, Inc., was organized as a Minnesota corpora-tion on February 11, 1958.

The office of the new corporation was located at Fairmont, Minnesota. At the time of its formation Lundquist individually was working on an uncompleted contract begun by the copartnership for the construction of the Emmet County courthouse at Estherville, Iowa. A public contractor's surety bond had been furnished by the copartnership on this project for the protection of plaintiff and others furnishing material under the contract. After formation of the corporation Lundquist continued to work on this contract to its completion and payments made upon it were placed in the account of the corporation to the extent of $25,564.02. Subsequent to the formation of the corporation two new contracts were entered into — one for the construction of a water-treatment plant at Fairmont and one for the construction of the Trimont School between Triumph and Monterey, Minnesota. On these two contracts New Amsterdam Casualty Company furnished the public contractor's bond required by Minn. St. 574.26. Plaintiff furnished steel to the corporation for these two projects.

On June 11, 1958, Lundquist Constructors, Inc., received $31,027.50 on the Trimont School project. This was deposited in its account in the Martin County National Bank of Fairmont. After this deposit had been made, the corporation paid to plaintiff the sum of $7,000 on June 13, 1958, and $6,000 August 13, 1958. These sums were applied by plaintiff on the previous indebtedness of the copartnership and Lundquist. At that time no billing had been made to the corporation for work on either the Trimont School or the Fairmont water-treatment project. The corporation had ordered steel from plaintiff for the Trimont School project, but very little of this had then been delivered.

There was evidence which would establish that Lundquist said nothing to plaintiff as to how these payments were to be applied, from which the implication could be drawn that plaintiff was justified in applying

them on its past-due accounts with the copartnership. There was evidence which would establish that while the printing on the checks indicated that they had been issued by Lundquist Constructors, Inc., it was established that the previous copartnership had operated under the name Lundquist Construction Company, and officers and representatives of plaintiff testified that none of them had realized that a corporation had been formed until March 1960.

Lundquist testified that none of the directors or shareholders of the corporation ever authorized him to apply corporate payments on other than the corporation's accounts, but there was evidence that the other officers and directors had placed complete control of the corporation in the hands of Lundquist and that the bylaws of the corporation provided:

"* * * The President shall be the chief executive officer of the corporation; he shall preside at all meetings of the Shareholders and Directors; he shall have general active management of the business of the corporation, and shall see that all orders and resolutions of the Board are carried into effect. He shall execute all bonds, mortgages and other contracts, but all construction contracts shall be approved by the Board of Directors. He shall be ex-officio a member of all standing committees, and shall have the general powers and duties of supervision and management usually vested in the office of President of a corporation."

■ The evidence established that Lundquist Constructors, Inc., referred to herein as Lundquist, Inc., after its formation at all times held itself out to plaintiff as successor to the previous copartnership and to Robert Lundquist individually. Plaintiff's prior accounts with the copartnership and Lundquist were carried over as accounts against the corporation on a continuous basis and the corporation was so billed each month. At no time did anyone protest this procedure on behalf of defendants. Lundquist, while president of the corporation, continued to perform and complete the work previously undertaken by the copartnership on the Emmet County courthouse project for which plaintiff had furnished the steel. Payments made by Emmet County officials to the copartnership on this work to the extent of $25,564.02 were accepted by the corporation and deposited in its bank account. Its accountant made

entries in its books showing all payments and disbursements of the corporation on bills received from the plaintiff, including the bills of the copartnership and Lundquist individually. The corporation's books clearly indicated that the balance of the corporation's indebtedness to plaintiff after the application of the corporate payments on the copartnership and Lundquist's accounts was as ultimately claimed in this action. This information was available to all directors and stockholders of Lundquist, Inc., and would have been disclosed to them by careful examination of its books. Certainly this much responsibility rested upon them. In this state of affairs, it was natural for plaintiff to carry the account as a continuing one against the corporation as it did.

■ The evidence also established that prior to the time that defendant New Amsterdam Casualty Company furnished the public contractor's bond on the Fairmont water-treatment project it had available to it information which would have disclosed an amount due from the corporation to plaintiff entirely consistent with that ultimately made the basis of this action. Its representative had examined the books of account of the corporation prior to the issuance of the bond. It further had required a financial statement from the corporation as well as from Lundquist individually. Examination of either of such statements would have disclosed that the amount claimed by plaintiff had been arrived at by application of the corporation's payments upon the previous indebtedness of the copartnership and Lundquist.

Likewise, a letter from plaintiff sent to this surety company on June 17, 1959, would have disclosed to the surety company that the amount claimed due by plaintiff on the Trimont project could have been arrived at only by the application of the corporation's checks of June 13, 1958, and August 13, 1958, on the copartnership indebtedness. Notwithstanding this the surety company made no protest and was content to issue the bond in June of 1959, almost a year after the corporate payments had been made.

■ In reliance upon the payments and induced by the corporation's conduct to assume that they could properly be applied to the account for materials furnished Lundquist and the copartnership, plaintiff took no measures to enforce payment of the account due it on the Emmet Coun-

ty courthouse project. No action was instituted against the copartnership or Lundquist individually, although at that time Lundquist was still the owner of substantial assets which he later turned into the corporation. Likewise, plaintiff instituted no action on the surety bond furnished on the Emmet County courthouse project. Had a protest been made on behalf of Lundquist, Inc., at the time the checks were delivered to plaintiff or had the surety protested the application of the payments on the copartnership account at the time it furnished the bond, plaintiff might even then have adjusted its account and pursued its remedies against the copartnership or Lundquist to enforce payment of the amount then due it. Further, had the account remained unpaid, it seems unlikely that plaintiff would have continued to furnish material to the corporation on the latter's contracts with Fairmont and the Trimont School project. By the time protest was first made by the surety company, both Lundquist and the corporation had become insolvent and plaintiff had lost any chance of collecting other than through the public contractor's bond. Under such circumstances, we adhere to the court's determination that —

"* * * [w]hether we call it estoppel or by some other name, it would seem to be clearly inequitable to permit the stockholders and directors of Lundquist Constructors, Inc., to successfully plead ignorance when they made no attempt to inform themselves as to what was going on or to protect themselves from just what happened here. Lundquist had several opportunities to inform Plaintiff of the change in his status. If his failure to do so was due to ignorance, that would not shift to Plaintiff the burden of ascertaining his status. If it was due to his deliberate defalcation, that is one of the hazards covered by the bond."

■ We find the fact situation here distinct from the facts involved in Ganley v. City of Pipestone, 154 Minn. 193, 191 N. W. 738, relied upon by defendants. Here there is evidence that Lundquist, Inc., through its active officer, held itself forth as a successor to the copartnership and Lundquist individually by taking over and completing their contracts and by accepting payments due for them as well as by consummating a transfer of their assets in exchange for corporate stock. Here there was also evidence that would establish that at the time it furnished its bond

440

the surety company was aware of what had taken place and made no objection to it. Here the officers and directors of the corporation had made Lundquist the sole agent of the corporation and placed in him all authority to act for it, making his acts the acts of the corporation, binding upon its stockholders. As the court stated in Lake Park Development Co. v. Steenberg Const. Co. 201 Minn. 396, 402, 276 N. W. 651, 654:

"It is urged that plaintiff had no knowledge of the transfers by Storr [plaintiff's officer] to defendant until after they had been made. This is not decisive. The transfers were within the authority conferred upon Storr. * * * The general authority comprehends the particular case. * * * Plaintiff is charged with Storr's knowledge under these circumstances."

Under these principles we hold that plaintiff has established its right to collect the full amount of its claim against defendants as alleged in its complaint, and as determined by the trial court.

Affirmed.